**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| KASEEM CAMEL, | : | Civil Action No. 17-5298 (JMV) |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| ATTORNEY GENERAL OF THE | : | |
| STATE OF NEW JERSEY, *et al.*, | : | |
| | : | |
| Respondents. | : | |
| | : | |

**Vazquez, United States District Judge**

Petitioner Kaseem Camel ("Petitioner"), a prisoner currently confined at New Jersey State Prison in Trenton, New Jersey, has filed a *pro se* Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (D.E. No. 1.) For the reasons that follow, the Court denies the Petition and denies a certificate of appealability.

## I.     FACTUAL BACKGROUND & PROCEDURAL HISTORY

The factual background and procedural history in this matter were summarized in part by the New Jersey Superior Court, Appellate Division upon Petitioner's direct appeal:[1]

> On the evening of November 29, 2006, someone shot three men (John Mumford, Dale Fisher and Sheldon Oaks) in the courtyard of the Grace Manor West townhouse complex in Newark. Mumford died after being shot four times, Fisher and Oaks recovered and later identified defendant as the shooter. However, at his trial they repudiated those identifications.

---

[1] The facts found by the Appellate Division are presumed correct pursuant to 28 U.S.C. § 2254(e)(1).

The police found an assault rifle and thirteen matching shell casings on the ground not far from the scene of the shooting. They also found a small handgun, which Oaks admitted was his. There was no dispute that Mumford's death was a homicide. At issue was the identity of the shooter and the shooter's degree of culpability. After several days of deliberations, the jury acquitted defendant of murder but convicted him of aggravated manslaughter of Mumford and two counts of aggravated assault on Fisher and Oaks.

. . .

At the trial, the State presented testimony that the police arrived at the scene of the shooting and found Mumford face down on the ground, unresponsive. The EMT's were called and pronounced him dead. The police also found Oaks lying nearby wounded. Oaks was taken to the hospital, where he gave the police a recorded statement describing the shooting. He told the police that he, Fisher and Mumford were sitting in the courtyard talking when they saw a man approaching them from the right. The man suddenly began shooting at them. Oaks and Fisher ran away, but were struck by bullets. Mumford was killed. On December 1, 2006, Detective Michael Chirico, who was not otherwise involved in the investigation, visited Oaks in the hospital and showed him an array of photographs. According to Chirico, Oaks identified defendant's photo from the array and "said that was the person that shot me and my friends."

During his subsequent Grand Jury testimony, Oaks reluctantly confirmed that he knew the person who shot him and that defendant was the shooter. However, at defendant's trial, Oaks insisted that he really did not know who shot him and that he only identified defendant because the police promised him that, if he did so he would receive a reduced sentence for illegally possessing the small handgun found at the shooting scene. Police witnesses denied making him any such promise.

In his trial testimony, Fisher admitted meeting with the police on November 30, 2006 and giving a statement describing the shooting. His version of the incident was essentially the same as Oaks' version, except Fisher saw two men approaching. He saw one of the men start to walk away while the other continued to advance. The latter suddenly began firing at Fisher and his companions. Fisher met with the police on December 6 to view a photo array. According to Detective Peter Chirico, Fisher identified a photograph of defendant and wrote on the back that this was the person who "walked up on us and shot us with the rifle." Fisher confirmed that information in a contemporaneous statement to the police. However,

at the trial Fisher insisted that he only signed the back of defendant's photo because the police told him "he was the one who shot me."

On cross-examination, Fisher admitted that a few months after he gave his statement to the police, he received a favorable plea bargain on drug charges that were pending at the time of the shooting. As part of that plea deal, he received probation rather than a prison term. He also admitted that he was allowed to remain on probation even though he incurred a second drug charge thereafter. In response to cross-examination, Fisher also insisted that he did not actually know the identity of the shooter. On re-direct, he denied that the police offered him favorable treatment in exchange for giving them any of his prior statements. On re-cross- examination, he answered "yes" when asked if he was "threatened with incarceration if [he] didn't agree to [his] identification of Mr. Camel."

At the crime scene, the police found a semi-automatic rifle with two live rounds in it as well as more than a dozen shell casings lying on the ground. Expert testimony established that those casings were fired from the rifle. The police also found a loaded twenty-two caliber handgun, which Oaks later admitted was his, but they found no twenty-two caliber shell casings.

Finally, the State presented testimony from Dr. Lila Perez, the forensic pathologist in charge of the Northern Regional Medical Examiner's Office. Dr. Perez has conducted over 6000 autopsies and reviewed hundreds of autopsies conducted by her subordinates. She did not conduct the autopsy of Mumford's body; that was performed by Dr. Mambo, another pathologist in her office. Without objection, Dr. Perez testified that she "adop[ted] Doctor Mambo's conclusions with regard to the cause of death and manner of death." She based her opinions on her review of Dr. Mambo's report and on photographs and X-rays taken during the autopsy. Her opinions about the type and angles of the bullet wounds were based on the photographs, which showed the size and shape of the wounds. She testified that the appearance of the bullet wound to Mumford's back showed that the bullet entered at "a steep angle." However, her opinion as to the internal damage done by the bullet that entered [decedent's] back appeared to be based on Dr. Mambo's report. She testified, without objection, that [decedent's] death was a homicide caused by gunshot wounds. Defense counsel did not cross-examine Dr. Perez.

. . .

3

On the fourth day of the trial, September 16, 2008, Juror Number Three was missing at the start of the trial day. Although a phone call to his mother revealed that he had "reported to the jury duty," he could not be found after a search of the courthouse. In response to the judge's inquiry, both the prosecutor and the defense counsel responded that they had no objection to the judge removing Juror Number Three and proceeding with thirteen jurors. However, the judge declared an additional short recess, at the end of which Juror Number Three was finally located in the courthouse and the trial resumed with all fourteen jurors. The testimonial portion of the trial concluded and the jury began an extensive period of deliberations.

After eight days of deliberations, on the morning of September 30, 2008, Juror Number Three brought in a letter from his high school principal stating that he was a special needs student and, in light of the number of days he had missed from school due to his jury service, he was in danger of not being able to graduate. Telephone calls from the court to the juror's school and to his mother elicited information that this juror had significant special needs in the form of mental health issues. The judge also indicated that earlier in the week, this juror had advised the court that he needed to take certain standardized tests that week. Defense counsel opposed excusing the juror and asked the judge to declare a mistrial based on the length of time the jury had been deliberating. The prosecutor argued that, although the jury had been deliberating for several days, they clearly had not decided any issues because they were continuing to request readbacks of testimony.

Based on *State v. Williams*, 171 N.J. 151 (2002), and *State v. Valenzuela,* 136 N.J. 458 (1994), the judge determined that the juror had "a valid personal reason" to be excused, because continued service would jeopardize his high school graduation. He found that there was "no conflict among any of the jurors," the juror's request was completely unrelated to the jury's deliberations, and there were alternates available. The judge found releasing the juror would not disadvantage either side. He also specifically noted that he was not basing his decision on the juror's special needs, which the court could accommodate if necessary. After an alternate juror was selected, the judge instructed the jury to "start your deliberations all over again" from "the very beginning of the deliberation process, just as if you are entering the jury room for the first time after listening to my charges." He instructed them to disregard all of their prior deliberations and particularly to ignore any opinions that Juror Number Three may have expressed. The reconstituted jury then deliberated for the rest of the day.

On the next day, October 1, 2008, the jury asked for additional instructions on the law applicable to murder, attempted murder and aggravated manslaughter. The judge gave an extensive re-charge on those issues, without objection from counsel. In response to a second question, later in the day, the judge gave the jury additional instructions on the elements of murder. The jury deliberated for the rest of that day.

On October 2, 2008, the jury resumed its deliberation. At lunchtime, Juror Number One sent out a note that she could not "serenely deliberate" and would like to communicate with the judge. The judge asked the jury to clarify whether they were deadlocked on one or more issues or simply having disagreements during their discussions, which he indicated was normal. However, on being sent back into the jury room, the jury continued deliberating without sending out a clarification. Instead, after lunch they sent out a note indicating that they had reached agreement "on four counts" but were "still deliberating on one count."

At this point, defense counsel asked the judge to voir dire Juror Number One as to "why she feels she cannot serenely deliberate." In response, the judge asked Juror Number One (the foreperson) if she "can . . . continue to deliberate." She responded "[t]o be honest, no." She indicated that the subsequent note concerning the jury continuing to deliberate on the one remaining count was "what the majority wanted to do." At that point, the judge gave an instruction to the entire jury that all twelve jurors must deliberate but that if they had reached a point where they could not reach agreement, they must advise the court that "the jury is not going to reach an agreement."  Three minutes later, the jury sent out a note that "all 12 jurors feel that they can continue to deliberate."

At that point, defense counsel moved for a mistrial on all counts based on possible coercion of Juror Number One. The judge denied the mistrial motion. However, he recalled Juror Number One to the courtroom and asked her if, when she wrote her note about "serenely deliberating," the jury had already "decided the four counts" referenced in their previous note. She said "yes." The judge sent her back to the jury room, and shortly thereafter, the jury indicated that they had reached a verdict.

*State v. Camel*, Indictment No. 07-08-2800, 2012 WL 996606, *1-5 (N.J. Super. Ct. App. Div.

Mar. 27, 2012).

Following the jury trial, Petitioner was convicted of aggravated manslaughter in violation

of N.J.S.A. § 2C:11-4a(1); two counts of aggravated assault, in violation of N.J.S.A. § 2C:5–1 and 2C:12-1b(2); unlawful possession of an assault firearm, in violation of N.J.S.A. § 2C:39-5f; possession of a weapon for an unlawful purpose, in violation of N.J.S.A. § 2C:39-4; and certain persons not to have weapons, in violation of N.J.S.A. § 2C:39-7b. *See Camel*, 2012 WL 996606, at *1. Petitioner was sentenced to an aggregate sentence of fifty years subject to the New Early Release Act. *Id.* The Appellate Division affirmed Petitioner's conviction but remanded for the limited purpose of reconsidering and explaining the consecutive sentences and for clarification of the Judgment of Conviction ("JOC"). *Id.* at *8. The New Jersey Supreme Court denied certification on October 25, 2012. *State v. Camel*, 54 A.3d 811 (N.J. 2012).

Petitioner subsequently filed a petition for post-conviction relief ("PCR"), which the court denied on October 31, 2014, after convening an evidentiary hearing. (D.E. No. 17-16.) On September 29, 2016, the Appellate Division affirmed the PCR Court's decision. *State v. Camel*, Indictment No. A-2776-14T2, 2016 WL 5417412 (N.J. Super. Ct. App. Div. Sept. 29, 2016). On February 1, 2017, the New Jersey Supreme Court denied Petitioner's petition for certification. *State v. Camel*, 159 A.3d 886 (N.J. 2017).

Petitioner filed the instant petition for habeas relief under § 2254 on July 19, 2017. (D.E. No. 1.) Respondents filed their Answer on January 22, 2018. (D.E. No. 17.) Petitioner filed a reply on April 19, 2018. (D.E. No. 24.) The matter is fully briefed and ready for disposition.

Petitioner raises the following claims in his federal habeas petition:

1. The trial court erroneously replaced a juror after deliberations began and the trial court erroneously denied a defense motion for a mistrial when a juror notified the court that she could not deliberate. (D.E. No. 1 at 6.)

2. The trial court erroneously admitted hearsay testimony by allowing the testifying medical examiner to read from an autopsy report created by another medical examiner. (*Id.* at 9.)

6

3. The trial court erroneously failed to provide a manslaughter jury charge as a lesser included offense of aggravated manslaughter. (*Id.* at 10.)

4. "The trial court deprived defendant of his constitutional right to a meaningful opportunity to present a complete defense." (*Id.* at 11.)

5. The trial court erroneously failed to conduct a pre-trial identification hearing. (*Id.* at 13.)

6. The trial court erroneously permitted a state witness to testify in prison garb and arm and leg restraints. (*Id.* at 14.)

7. Petitioner was denied his right to effective assistance of counsel. (*Id.* at 15.)

8. Petitioner was denied his right to effective assistance of counsel as a result of counsel's failure to call Lakeesha Kelly as an alibi witness. (*Id.* at 17.)

## II.    STANDARD OF REVIEW

Section 2254(a) permits a court to entertain claims alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Petitioner has the burden of establishing each claim in the petition. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013). Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254 ("AEDPA"), federal courts in habeas corpus cases must give considerable deference to determinations of state trial and appellate courts. *See Renico v. Lett,* 599 U.S. 766, 772 (2010).

Section 2254(d) provides in pertinent part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Where a state court has adjudicated a petitioner's federal claim on the merits, a federal court "has no authority to issue the writ of habeas corpus unless the [state c]ourt's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Parker v. Matthews*, 567 U.S. 37, 40-41 (2012) (quoting 28 U.S.C. § 2254(d)). AEDPA deference applies even when there has been a summary denial. *Cullen v. Pinholster*, 563 U.S. 170, 187 (2011) (citation omitted).

"[C]learly established law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme Court's] decisions," as of the time of the relevant state-court decision. *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000))). A federal court "may grant the writ if the state court arrives at a conclusion opposite to that reached by this [Supreme] Court on a question of law or if the state court decides a case differently than this [Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-413 (internal quotation marks omitted). In addition, a federal court must confine its examination to evidence in the record. *Cullen*, 563 U.S. at 180-81.

Where a petitioner seeks habeas relief, pursuant to § 2254(d)(2), on the basis of an erroneous factual determination of the state court, two provisions of AEDPA apply. First, AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). Second, AEDPA precludes habeas relief unless the adjudication of the claim "resulted

8

in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Moreover, a federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the court of the State." 28 U.S.C. 2254(b)(1)(A). To do so, a petitioner must "fairly present all federal claims to the highest state court before bringing them in a federal court." *Leyva v. Williams*, 504 F.3d 357, 365 (3d. Cir. 2007) (citing *Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 369 (3d Cir. 2002)). This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'" *Id.* (citing *United States v. Bendolph*, 409 F.3d 155, 173 (3d Cir. 2005) (quoting *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981)).

In addition, a federal court may not grant habeas relief if the state court's decision rests on a violation of a state procedural rule. *Johnson v. Pinchak*, 392 F.3d 551, 556 (3d. Cir. 2004). This procedural bar applies only when the state rule is "independent of the federal question [presented] and adequate to support the judgment." *Leyva*, 504 F.3d at 365-66 (citing *Nara v. Frank*, 488 F.3d 187, 196, 199 (3d Cir. 2007); *see also Gray v. Netherland*, 518 U.S. 152 (1996); *Coleman v. Thompson*, 501 U.S. 722 (1991)). If a federal court determines that a claim has been defaulted, it may excuse the default only upon a showing of "cause and prejudice" or a "fundamental miscarriage of justice." *Leyva*, 504 F.3d at 366 (citing *Lines v. Larkins*, 208 F.3d 153, 166 (3d Cir. 2000)).

To the extent that a petitioner's constitutional claims are unexhausted and/or procedurally defaulted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005).

9

### III.    ANALYSIS

The instant Petition raises eight grounds for relief, which are reviewed in turn.

### A.    Trial Court Errors

#### 1.  Trial Court's Erroneous Handling of Juror Issues

In ground one of his federal habeas petition, Petitioner asserts that the trial court erroneously replaced a juror after deliberations began and the trial court erroneously denied a defense motion for a mistrial when a juror notified the court that she could not deliberate.  (D.E. No. 1 at 6.)  Turning to the first argument, Petitioner asserts that the trial court erroneously permitted a juror to be substituted with an alternate juror after deliberations began.  The state responds that Petitioner has not raised a valid constitutional claim and the state court's decision was consistent with state and federal court of appeals' precedent.  (D.E. No. 17 at 16-17, 21-24.)

Petitioner initially raised the instant claim on direct appeal.  *See Camel*, 2012 WL 996606 at *1.  On habeas review, the district court must review the last reasoned state court decision on each claim, *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991), which is the Appellate Division's opinion on direct appeal.  The Appellate Division denied the claim as follows:

> On this record, we find no error in the judge releasing Juror Number Three. *Rule* 1:8–2(d)(1) permits the substitution of an alternate juror during deliberations if a juror becomes ill or otherwise unable to continue serving. "The *Rule* attempts to strike a balance between the need for judicial economy, especially in the context of lengthy trials, and the fundamental right of defendants to a fair trial by jury." *Valenzuela, supra,* 136 *N.J.* at 467. However, in order to avoid interfering in the jury's deliberative process and impairing a defendant's right to a trial by jury, the reasons for excusing a juror must relate to the juror's "personal situation" and "not to his interaction with the other jurors or with the case itself." *Id.* at 468. A juror's personal situation may include financial hardship. *Williams, supra,* 171 *N.J.* at 156.
>
> "If a court suspects that the problems with the juror are due to interactions with other jurors, the court should instruct the jury to

resume deliberations. If the jury remains unable to return a verdict, the court should determine whether further deliberation would allow the jury to reach a verdict. If the jury indicates intractable deadlock, the court should declare a mistrial." *Valenzuela*, supra, 136 N.J. at 473.

On the other hand, if a juror's personal situation appears to justify dismissal, the court must still consider whether the jury has progressed so far in its deliberations that it is not realistic to expect that the jury will be able to start its deliberations anew with the substituted juror:

> Thus, where the deliberative process has progressed for such a length of time or to such a degree that it is strongly inferable that the jury has made actual fact-findings or reached determinations of guilt or innocence, the new juror is likely to be confronted with closed or closing minds. In such a situation, it is unlikely that the new juror will have a fair opportunity to express his or her views and to persuade others. Similarly, the new juror may not have a realistic opportunity to understand and share completely in the deliberations that brought the other jurors to particular determinations, and may be forced to accept findings of fact upon which he or she has not fully deliberated.

[*State v. Corsaro,* 107 *N.J.* 339, 352 (1987).]

In that regard, it is important to consider not only the length of time the jury had been deliberating, but whether the jury appeared to already have made decisions on one or more counts, whether the trial court provided a thorough charge on the jury's obligation to begin its deliberations anew, and how long the jury took to render a verdict after the substitution. *State v. Williams,* 377 *N.J.Super.* 130, 149 (App.Div.), *certif. denied,* 185 *N.J.* 297 (2005). "No bright line rule in respect of the length of jury deliberations triggers a finding that deliberations have progressed too far to permit the substitution of an alternate." *Williams, supra,* 171 *N.J.* at 169. And, we owe deference to the trial judge's evaluation of a juror's situation. *Id.* at 170.

Applying these standards, we find no basis to second-guess the trial judge's exercise of discretion in excusing Juror Number Three. The juror's situation was clearly personal to him and was completely unrelated to the jury's deliberations. The possibility that he would be

unable to graduate from high school due to excessive absences was
a hardship that justified excusing this juror. Further, although the
jury had deliberated for several days, the record strongly suggests
that it had not made any decisions on the verdict. The trial judge
thoroughly instructed the jury on its obligation to begin its
deliberations from the beginning. Thereafter, the newly-constituted
jury requested some additional instructions on the law and
deliberated for at least an additional day before advising the judge
that they had reached a partial verdict. Under these circumstances,
the trial judge did not abuse his discretion in excusing the juror or in
declining to declare a mistrial.

*Camel*, 2012 WL 996606 at *4-6.

At trial, once deliberations were under way Juror Number Three provided the court with a letter from his high school assistant principal indicating that he was in jeopardy of not graduating because of his several absences.  (D.E. No. 18-14 at 5.)  The trial judge then contacted the high school as well as Juror Number Three's mother for additional information.  (*Id.* at 8-9.) Subsequently, Petitioner's trial counsel moved for a mistrial, and the following colloquy occurred:

MR. KINSALE:   Judge, I'm concerned about the length of
deliberations, the amount of time we have invested in deliberations
at this point, and the extent to which I would suggest to the Court
that deliberations have gone too far now for us to even substitute
somebody else in, and our only remedy may be a mistrial at this
point.

THE COURT:  And what would be the theory for a mistrial?  You
have given me no basis.  I have received no letter or position from
the jury that they are deadlocked, that they are tired, that they don't
want to retire to deliberate. They haven't said anything. They don't
even know the issue going on with juror number three. They have
said nothing about not wanting to continue.

MR. KINSALE:   But the suggestion is we may have a juror
deliberating who was unable to deliberate.

THE COURT:  I don't know whether he is or isn't. That's not a
determination I can make. I'm only bringing to you, first of all, the
letter that came to me by way of a letter.

If you want juror number three to remain in there, that's something that you could indicate.  I think that under *State versus Valenzuela* that this particular juror has a personal issue which is exclusive of deliberation and exclusive of any malice going on in the deliberation room.

I find that his personal issue and his handicap is one that should excuse him, but I find also troubling that he may jeopardize graduating from school, which is less of an issue to me than the issue that he suffers from his special needs, but if you believe that based on his special needs, he is a juror who can continue to deliberate, than we can always talk about the sub-issue of his being in danger to graduate.

There's nothing before me right now in excusing juror number three that has to do with how the jury is deliberating.

I have no idea where they are in their deliberations, and there's nothing to indicate that juror number three is a problem in the deliberations.  They seem to be getting along very well for the period of time that they have been deliberating. There's been no letters to come out to say we are fighting. They are asking for work to understand their case and they are deliberating.

MR. KINSALE:  Your Honor, I'm going to ask that the jury be permitted to continue deliberating without any interference from the Court.

THE COURT:  All right.  Mr. Dirkin?

MR. DIRKIN:  Your Honor, it's clear that the issue with this juror is personal and not something that has happened in the jury room.

It's clear that even if we just take the graduation aspect of it, I believe it's *State v. Williams* indicates that a financial hardship is sufficient reason to dismiss a deliberating jury.

Certainly this man's future and his ability to graduate from high school would fall into that category. That's before even getting to the illness that he apparently suffers from that would, I think, qualify as a juror who is ill and unable to continue deliberating.

Your Honor, for these reasons, I think, at this point, it's appropriate to place an alternate in the place of juror number three.

13

I also submit that identity is a main component of this case and the jury, just on Friday, it received a lengthy amount of read back on identity.  So it's clear that the jury has not gone so far in the deliberations that the substitution of an alternate juror would impact this jury in any way.

So I would ask the Court to substitute in an alternate for juror number three at this time.

THE COURT:  All right.  Can you give me a copy of *State versus Williams*.

MR. DIRKIN:  If you give me a moment, your Honor.

THE COURT:  Since you didn't give me the citation.

MR. DIRKIN:  171 N.J. 151.

THE COURT:  Why don't you get the Court a copy and then I will look at that.

MR. DIRKIN:  I'll do that right now.

THE COURT:  Thank you. All right.  Continuing on the record.

MR. KINSALE:  Your honor, as to the graduation issue, I'm not sure if that's something we should be concerned about.

I think, given his circumstance, whatever it may be, and I would suggest as vague as it is coming to us, if the school is trying to help this guy out, juror number three out, they can make whatever accommodations they can do to manipulate his scheduled agenda to make graduation a reality for him; extra credit, extracurricular work.

I don't think that falls in the hardship of *State versus Williams*, or the case that the prosecutor speaks of. The illness, which I think is a primary issue secondarily to the graduation issue, apparently whatever issue he has, it's controlled by medication. He is medicated and, apparently for all intents and purposes, functional, I submit.

THE COURT: So, if I understand, Mr. Kinsale, the fact that the assistant principal indicates that he is in jeopardy of graduating and he has missed eight days and should be dismissed immediately, you don't consider that a personal reason to excuse the juror?

14

MR. KINSALE:  No, your Honor.

THE COURT:  The juror brought the letter in, by the way. Just so that the record is clear, it wasn't sent to me by the school, it was brought by the juror.

MR. KINSALE:  I mean, my feeling is there are other measures the school should take. I don't think that that's something they should put on us, that if we keep him on jury duty, he doesn't graduate.

He has been here for the last three weeks.  We let him go back now and now he's able to matriculate.  I don't think it's that simplistic. You know, I don't think we resolve that graduation issue by releasing him from your duty.  I think that's a red herring.

THE COURT:  A red herring?

MR. KINSALE:  I think – I don't think us keeping him here denies this kid from graduating. If they want to recognize he is a special needs kid, there are things I'm sure they can do to accommodate his circumstance.

As we have indicated, there's nothing to indicate that he is not able to perform his civic duty as a juror, notwithstanding whatever illness, as the prosecutor characterized it, whatever his mental circumstance is.

THE COURT:  Yeah, I'm saying I don't see anything in here that would indicate his inability to continue, other than for a personal reason.  This is exclusively personal.

This is not an excusal because he's at odds with anyone. It's a request to excuse him because he is a high school student who has lost a number of days in class and in danger of graduating.  He's a high school student.  He's not a college student.

He is a person who is in high school who happens to be of the age that he could be on jury duty, 18 or older, but he is in jeopardy of not graduating.   Whether they could provide measures to accommodate him is something that I guess they will have to determine if he is not excused, I could agree with that.

But the issue is, is this a personal reason to excuse the juror, and strictly a personal reason. I don't think that there's anything before me that would indicate that there's any reason to excuse this juror, other than personal. In other words, there's nothing before me that

15

says this juror is – he could be leading the deliberations for all I know.

There's nothing to indicate that the deliberation process is a reason to excuse him. It's simply a personal reason that jeopardizes something in his personal life, compounded by the fact that he has – I indicated he has two issues before me; his special needs, and the fact that he may not graduate based being on jury duty.

. . .

THE COURT:  All right.  I have considered the arguments of both sides.  I have considered the case that the State has provided, *State versus Williams*, 171 N.J. 151.  I have also considered the case of *State versus Valenzuela* at 136 N.J. 458.  I have reviewed the letter which is submitted by the school, which will be marked as an exhibit, and based on what I have seen in the case, I am satisfied that the juror in this case, juror number three, needs to be excused.

I don't believe it's to the advantage of the defense or to the State to excuse him at this point.  I don't believe it's to the disadvantage of the State or defense to excuse him.

I find that he has a valid personal reason which would jeopardize something very dear to his life-long career, and that's graduating from high school.

The juror has sat on these deliberations for a period of time which far exceeds what anyone expected him to do, but that's not unusual. It's something that occurs.  But to continue the juror on this jury and jeopardize his ability to graduate does not make sense to this Court if we have alternates to impose.

I also do not want to get to a point where the jury may get to a point of fighting and then excuse a juror for a personal reason.

In other words, I know that come Thursday, that juror number three has a standardized test and he can't be here on Thursday.  And I don't know how long this jury would deliberate, but I don't want to get to a point where there is a fight amongst jurors and then it appears that juror number three is only being excused because there is a conflict now and he has a personal reason.  I could not excuse him at that point for that.

16

We don't have that at this point in the case.  There's no conflict among any of the jurors, none whatsoever, and I find this to be a valid personal reason to excuse the juror.

I don't even have to address this issue of his special needs.  We would attempt to accommodate a special needs person in accordance with the Americans with Disabilities Act if we are given the information to accommodate them.

We weren't given the information, so there's no accommodations we really could make for the juror; but, again, I don't have to reach that point, in that failing to graduate, after being on the deliberating jury and deliberating faithfully and in good faith, is enough reason to excuse him.

So juror number three will be excused.  We will select the alternate.  Mr. Samsudeen will place both names in a spindle.  We will use the same process we used to select the original jurors.

MR. KINSALE:  Note my objection, your Honor.

THE CLERK:  [J.M.], juror number four.

THE COURT:  All right.  [J.M.] will be inserted into the jury.

. . .

THE COURT:  Ladies and gentlemen, juror number three has been excused.  An alternate juror has been selected to take his place.

Ladies and gentlemen, at this moment, you are a new jury.  That means you are to start your deliberations all over again.  The State and the defendant have a right to a verdict which is reached by 12 jurors who have had the full opportunity to participate in deliberations from start to finish.

The alternate juror will enter the juror room with no knowledge of any deliberations that may have already taken place.

The remaining jurors and the alternate juror must begin at the very beginning of the deliberation process, just as if you are entering the jury room for the first time after listening to my charges.

The initially selected jurors must disregard whatever may have occurred and anything which may have been said in the jury room since you entered the jury room after listening to my initial charges.

> In beginning your deliberations again, you are to give no weight to any opinion which juror number three may have previously expressed in the jury before he was excused. You must eliminate any impact that juror number three may have had on your deliberations.
>
> Together as a new jury you shall consider the evidence all over again as you conduct full and complete deliberations until you have reached a unanimous verdict.
>
> . . .
>
> Again, ladies and gentlemen, you are a new jury. You are to start anew. The instructions that I just provided to you, if you have any questions concerning them, I will provide them again.

(D.E. No. 18-14 at 13-20, 24-26, 28-29.)

"[T]he Due Process Clause guarantees the fundamental elements of fairness in a criminal trial." *Riggins v. Nevada*, 504 U.S. 127, 149 (1992). In the field of criminal law, "the category of infractions that violate 'fundamental fairness' [is defined] very narrowly based on the recognition that, beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Medina v. California*, 505 U.S. 437, 443 (1992). In order to satisfy due process, Petitioner's trial must have been fair, but it need not have been perfect. *United States v. Hasting*, 461 U.S. 499, 508-09 (1983) ("[T]here can be no such thing as an error-free, perfect trial, and [] the Constitution does not guarantee such a trial.").

The state court's decision was not an unreasonable application of clearly established federal law. Here, Petitioner has not raised a valid constitutional violation. While the Supreme Court has not addressed a claim of this nature, the United States Court of Appeals for the Third Circuit has ruled that a trial court's decision to substitute a juror once deliberations were under way, was not a violation of the Petitioner's Sixth or Fourteenth Amendment constitutional rights. *See Claudio v. Snyder*, 68 F.3d 1573, 1576-77 (3d Cir. 1995). Petitioner has not established how

he suffered prejudice by the trial court's substituting Juror Number Three, and within this context violated his right to a fair trial. The trial judge clearly made all efforts to verify the issue of juror number three's personal conflict. The trial judge subsequently assigned an alternate juror and instructed the jury to begin deliberations anew. Therefore, this claim is denied.

Petitioner also claims that the trial court erroneously denied a defense motion for a mistrial despite Juror Number One expressing concerns about her ability to deliberate. (D.E. No. 1 at 6.) Petitioner argues that the juror's "deliberations appeared not to be an exercise of her free and untrammeled will." *(Id.)* To the extent that Petitioner is arguing that the trial court violated his Sixth and Fourteenth Amendment rights to a trial by an impartial jury, the record belies this claim. Respondents submit that not only has Petitioner not raised a constitutional claim, but also that the state court properly applied state law principles on how a trial court should proceed under the circumstances. (D.E. No. 17 at 26-28.)

Petitioner initially raised the instant claim on direct appeal. The Appellate Division denied the claim as follows:

> We likewise find no abuse of discretion in the judge's denial of a mistrial when Juror Number One initially indicated that she could not deliberate "serenely." She did not indicate that she felt coerced by her fellow jurors. After questioning her and simply being told that she could not continue to deliberate, the judge followed precisely the procedure set forth in *Valenzuela.* He instructed the jury as a whole to resume deliberations and advise him, as a group, if they could not reach a verdict because they were deadlocked. *Valenzuela, supra,* 136 *N.J.* at 473. Shortly thereafter, the jury sent out a note that they were not deadlocked.
>
> After defense counsel requested a mistrial on all counts, the judge re-interviewed Juror Number One and ascertained that her note about serenely deliberating related only to the one count on which the jury had not yet reached a verdict. The judge in no way suggested that this juror should change her views on that count nor did any of his instructions pressure the jury as a whole to reach a verdict. We

19

find no abuse of the judge's discretion in denying the mistrial motion and in allowing the jury to continue its deliberations.

*Camel*, 2012 WL 996606 at *6.

Here, the record reflects that once juror one sent her initial note, the trial court further inquired of the jury's ability to deliberate. The trial court's inquiry was as follows:

> THE COURT: I have a question: Juror number " - - and it lists the number, which I will not reveal - - doesn't feel that - - has gender, I will not reveal - - can continue, I believe this is "to serenely deliberate" and would like to communicate with the Court about this.
>
> Ladies and gentlemen, what I need you to do is to send me another letter or note and indicate your concern. In other words, if you are deliberating and you are at odds or disagreement, that's part of deliberation.
>
> If you are at a point where you cannot reach an agreement, then I need you to tell me that you are deadlocked on that issue. In other words, you have a verdict sheet and it has a number of counts. I need to understand this.
>
> Please send me a note. If what you are saying to me is that you are not going to reach an agreement on a subject matter, tell me that. We are not—I do not believe the jury will be able to reach an agreement on, for example, count one or count two or all the counts.
>
> If you have already decided some issues, you should say that as well without revealing the verdict.
>
> In other words, if you have decided an issue, say: Issue one, we have resolved issue one. We are unable to resolve issue two. That's another way you can write it. This way I will have an idea of what it is you are saying to me.
>
> All right. So I don't want you to tell me any verdicts in the note. I simply need you to tell me whether you have reached any agreements on any subject matter; and if you have not reached an agreement on any subject matter, say that. We have not reached an agreement on any subject matter and I don't believe we will.
>
> All right. Then I will address you at that point. Alright. Thank you.

(D.E. No. 18-16 at 4-5.)

The jury responded that it could deliberate and subsequently provided a note indicating they had reached a verdict on four counts and were still deliberating on count one.  (*Id.* at 28.) After defense counsel moved for a mistrial, the trial court recalled Juror Number One for further inquiry.  The following colloquy then occurred:

> THE COURT:  I need a clarification.  We are on the record, outside the presence of all jurors except juror number one.
>
> When you sent me the first note concerning serenely deliberating and then I sent you back in, a note was sent out that the jury had an agreement on four counts, but still deliberating on one count.
>
> Without telling me what's been decided, when you wrote the first note, had the jury decided the four counts?
>
> THE JUROR:  Yes.
>
> THE COURT:  So your note only concerned the one count that was unresolved?
>
> THE JUROR:  Correct.
>
> THE COURT:  All right.  Thank you, ma'am.  You can return.  Thank you.
>
> (Whereupon, the juror is excused from the courtroom.)
>
> THE COURT:  All right.  Continuing on the record outside the presence of the jury.
>
> I requested that clarification because as I said to Mr. Kinsale, I don't believe that any request for a mistrial would have applied to something that had already been decided, but rather than speculate what they did, I asked the juror what her concerns were to and that would have been with respect to count one.
>
> Notwithstanding her answers, I'm still denying your request for a mistrial as it relates to count one, but I don't know what authority the defense would have to make a request for a mistrial on all counts given what I thought, the questions was one count of the indictment.

(D.E. No. 18-16 at 33-34.)

In light of Juror Number One's representation to the trial court, Petitioner's argument that her "subsequent deliberations" were not an exercise of her free will, fails. Petitioner has not provided any facts or arguments as to why the juror's deliberation was against her free will. The record indicates that the trial court solely inquired about whether the jury could deliberate in light of Juror Number One's note, and nothing more. Even if this Court were to construe Petitioner's argument to mean that the juror was coerced by the trial court to continue deliberating, Petitioner's claim would be purely speculative. There is little constitutional precedent governing claims of this nature, but Petitioner's claim may fall under the limited ambit of precedent addressing jury coercion. "Defendants have a right against coerced jury verdicts, and any potential coercion should be measured based on the totality of the circumstances." *Clements v. Clarke*, 592 F.3d 45, 58 (1st Cir. 2010) (citing *Lowenfield v. Phelps*, 484 U.S. 231 (1988)). Here, the trial judge's inquiry into whether the jury could continue to deliberate in light of Juror Number One's statement cannot reasonably be construed as unconstitutional coercion. *See id.* at 52 (holding that trial judge's instruction for the jury to continue deliberating after conducting individual voir dire of the jurors to determine whether one juror made a biased comment, was not improper). Consequently, the state court's decision was not an unreasonable application of the facts nor was it contrary to clearly established federal law. Accordingly, this claim is denied.

### 2. Trial Court's Erroneous Admission of Hearsay Testimony

Petitioner next submits that the trial court erroneously admitted Dr. Lila Perez's hearsay testimony in violation of the Sixth Amendment's Confrontation Clause. (D.E. No. 1 at 9.) Respondents contend that Petitioner waived this claim because he did not object to it at trial and that the claim also fails on the merits. (D.E. No. 17 at 29-38.)

The Appellate Division denied the claim as follows:

> We turn next to defendant's contention that Dr. Perez's testimony included inadmissible hearsay and violated his rights under the Confrontation Clause. Given the Supreme Court's previous decisions, we consider it likely that the Court would deem an autopsy report prepared by a state medical examiner's office to be testimonial hearsay. *See Bullcoming v. New Mexico*, 564 U.S. 2705, ——, 131 S.Ct. 2705, 2716–17, 180 L. Ed.2d 610, 622–23 (2011); *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 2532–38, 174 L. Ed.2d 314, 321–28 (2009) (discussing testimonial hearsay, and the legal status of "coroner's reports"). However, we decline to definitively address the issue here, because defendant did not raise the issue at trial, thereby waiving the issue for purposes of appeal absent plain error. R. 2:10–2; *see Melendez–Diaz*, *supra*, 129 S.Ct. at 2534 n. 3, 174 L. Ed.2d at 323 (noting that confrontation rights may be waived "by failure to object to the offending evidence"). We find no plain error. *See State v. Macon*, 57 N.J. 325, 336 (1971).
>
> Defense counsel did not even cross-examine Dr. Perez, and with good reason. There was no genuine issue at this trial about the cause of Mumford's death. The police found his bullet-riddled body lying in the courtyard, soon after the shooting incident that was described by eyewitnesses Oaks and Fisher. No one, including the defense, argued that his death was not a homicide. The issue in the case was the identity of the killer. To the extent that the prosecution argued, based on a couple of sentences of Dr. Perez's testimony, that the autopsy proved an intentional murder, that argument failed; the jury acquitted defendant of murder. Therefore, if Dr. Perez testified to Dr. Mambo's observations about the trajectory of the bullet that entered Mumford's back, any error was harmless. *Macon*, supra, 57 N.J. at 336.
>
> We add one final observation. In failing to raise a hearsay objection to Dr. Perez's testimony, defendant deprived the State of the opportunity to explain Dr. Mambo's absence from the trial and the opportunity to call him as a witness if he was available. The defense also deprived the prosecution of the opportunity to elicit more specific testimony from Dr. Perez to make clear whether her opinions were based on Dr. Mambo's report or whether she had reached, or could reach, her own independent expert opinions based on the autopsy photos and X-rays or other sources besides Mambo's report. *See State v. Rehmann*, 419 N.J.Super. 451, 457 (App .Div.2011). In the context of this case, the interests of justice do not require that we further address defendant's arguments, raised for the

> first time on appeal, concerning the admissibility of Dr. Perez's
> testimony.

*Camel*, 2012 WL 996606 at *7.

The Sixth Amendment's Confrontation Clause, which is binding on the States through the Fourteenth Amendment, provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. AM. VI. The standard for determining a Confrontation Clause violation was outlined in the United States Supreme Court's opinion in *Crawford v. Washington*, 541 U.S. 36 (2004). In *Crawford*, the Supreme Court held that the prosecution could not use the police statement of a wife against her defendant husband at trial, where the wife was unavailable as a witness due to the spousal privilege. *Id.* at 68-69. "[T]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986) (internal citations and quotation marks omitted). In *Crawford*, the Supreme Court held that the Sixth Amendment's Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant has had a prior opportunity for cross-examination." 541 U.S. at 53-54. "[A] criminal defendant states a ... Confrontation Clause [violation] by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness [.]'" *Van Arsdall*, 475 U.S. at 680 (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)). "Even after *Crawford*, however, '[t]he [Confrontation] Clause ... does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.'" *Adamson v. Cathel*, 633 F.3d 248, 256 (3d Cir. 2011).

As Respondents point out, while the Supreme Court has not addressed how an expert witness's testimony implicates the Confrontation Clause, this Court and others in this circuit have

denied similar challenges by criminal defendants. Indeed, "there is no "clearly established Federal law" or "squarely established" rules concerning autopsy reports." *Johnston v. Mahally*, 348 F. Supp. 3d 417, 435 (E.D. Pa. 2018) (denying habeas relief to a petitioner who argued that a medical examiner, who was not directly involved in performing certain autopsies, violated the Confrontation Clause when he rendered expert testimony on the victims' cause and manner of death based on photographs of the corpses, toxicology reports, and the autopsy reports prepared by his former colleagues).

Here, the record reflects that Dr. Perez, who was qualified as an expert without objection, testified about the contents of the autopsy report of decedent, John Mumford. (D.E. No. 18-6 at 7.) The autopsy was conducted by Dr. Nobby Mambo. Dr. Perez testified that she reviewed the autopsy report prepared by her former colleague, as well as the photographs and adopted Dr. Mambo's findings. (*Id.*) Petitioner's trial counsel did not object to Dr. Perez's testimony, nor did he cross-examine her. (*Id.* at 12.) Petitioner has not demonstrated how the state court's decision was an unreasonable application of the facts or contrary to clearly established federal law. Accordingly, this claim is denied.

### 3. Trial Court's Failure to Give Manslaughter Jury Instruction was Error

Petitioner next submits that the trial court's failure to *sua sponte* charge the jury on the law of manslaughter was erroneous. (D.E. No. 1 at 10.) Respondents counter that the evidence at trial did not support such an instruction particularly because "petitioner sprayed his victim with bullets from a semi-automatic rifle." (D.E. No. 17 at 38.) Respondents add that the state court's ruling was consistent with state and federal law that requires that jury instructions should be supported by the evidence at trial. (*Id.* at 38-40.)

When denying this claim on Petitioner's direct appeal, the Appellate Division ruled as follows:

> Defendants point III and IV are completely without merit and warrant no discussion beyond the following comments. R. 2:11-3(e)(2). The judge was not required to sua sponte charge the jury on reckless manslaughter, because the evidence would not support a verdict on that charge. There was "no rational basis in the evidence" to find that defendant was not guilty of aggravated manslaughter but was guilty of reckless manslaughter. *State v. Sloane*, 111 N.J. 293, 299 (1988). We conclude that an assailant who sprays his victims with gunfire from a semi-automatic rifle "is necessarily aware that 'it is a practically certain' this conduct will cause death or serious bodily injury. N.J.S.A. 2C:2-2b(2)." *State v. Mendez*, 252 N.J. Super. 155, 161 (App. Div. 1991), certif. denied, 127 N.J. 560 (1992).

*Camel*, 2012 WL 996606 at *7.

State court evidence-related determinations are normally matters of state law and not reviewable in federal habeas proceedings. *See Engle v. Issac*, 456 U.S. 107 (1982); *Henderson v. Kibbe*, 431 U.S. 145 (1977); *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 309 (3d Cir. 1991). Moreover, Petitioner has not demonstrated how the state court's determination was contrary to clearly established federal law. "[D]ue process requires that a lesser included offense instruction be given only when the evidence warrants such an instruction." *Hopper v. Evans*, 456 U.S. 605, 611 (1982).

As Petitioner acknowledges, the trial court granted his counsel's request to instruct the jury on aggravated manslaughter. (D.E. No. 18-6 at 18-19.) In fact, the Court notes that the trial judge asked trial counsel to support his request for an aggravated manslaughter charge in light of the evidence that was presented. However, Petitioner has not pointed out how the trial evidence supported a *sua sponte* instruction for the lesser included offense of manslaughter. Consequently,

the state court's decision was not an unreasonable application of the facts nor was it contrary to clearly established federal law.  Accordingly, this claim is denied.

### 4.  Trial Court's Erroneously Limitation the Defense's Opportunity to Cross-Examine

Petitioner next submits that the trial court erroneously denied his counsel an opportunity to effectively impeach state witness Dale Fisher about any leniency he may have received from the prosecution in his own criminal prosecution as a result of his cooperation as well as any motive to kill the decedent to eliminate competition in the drug business.  (D.E. No. 1 at 11-12.)  Respondents answer that the state court rightly affirmed the trial court's decision to prohibit any testimony about the possibility of Fisher's motive to kill the decedent.  (D.E. No. 17 at 43-48.)

During cross-examination, Petitioner's counsel asked Fisher about his arrest in September 2006, two months before the decedent's murder.  (D.E. No. 18-5 at 32.)  The Appellate Division denied this claim on Petitioner's direct appeal as follows-

> Defense counsel's theory of third-party guilt- that Fisher and Oaks killed Mumford to eliminate a competitor- was entirely speculative and therefore inadmissible.  *See State v. Koedatich*, 112 N.J. 225, 299-300 (1988), cert. denied, 488 U.S. 1017, 109 S. Ct. 813, 102 L. Ed. 2d 803 (1989).  This far-fetched theory was based on conjecture and, since all the shell casings found at the scene came from the same gun, it would have required the jury to believe that Oaks and Fisher shot themselves.

*Camel*, 2012 WL 996606 at *8.

"Generally speaking, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).  While the Confrontation Clause guarantees a criminal defendant the right to confront witnesses on cross-examination, a trial court retains "wide latitude insofar as the Confrontation Clause is concerned

to impose reasonable limits on such cross-examination based on concerns about, among other things harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*. 475 U.S. at 678-79.

Here the Appellate Division's reasoning as to why the trial court did not err in limiting counsel's inquisition as to a possible motive for either Fisher or Oaks to kill the decedent does not run afoul of Petitioner's Sixth Amendment rights. As the Appellate Division noted, this theory was "entirely speculative"; in other words, it was not supported by evidence. Further, as the Appellate Division noted, all of the shell casings at the crime scene came from the same firearm, therefore, the defense's proffered theory would require a fact finder to believe that at least one of the victims shot themselves. Consequently, the state court's decision was not an unreasonable application of the facts nor was it contrary to clearly established federal law. Accordingly, this claim is denied.

Petitioner also appears to be challenging the trial court's decision to prohibit cross-examination about Fisher's May 2007 arrest and subsequent disposition of that case. Petitioner's counsel objected to the trial court's ruling (D.E. No. 18-5 at 39), however, the issue was not addressed by the Appellate Division. Nonetheless, this Court will review the claim *de novo*. *See Granberry v. Greer*, 481 U.S. 129, 131, 135 (1987) (noting that the exhaustion requirement is not a jurisdictional requirement to habeas corpus jurisdiction and that a district court may deny a claim on its merits despite non-exhaustion "if it is perfectly clear that the applicant does not raise even a colorable federal claim.").

At the sidebar discussion, counsel argued that the arrest was relevant because the state did not initiate probation violation proceedings despite the re-arrest constituting a violation. (D.E. No. 18-5 at 41.) Although the trial court did initially prohibit this line of questioning, it subsequently

allowed Fisher to speak about his May 2007 arrest. Therefore, despite the trial judge's initial opposition to allowing the testimony in, the court eventually permitted Fisher to testify about the May 2007 arrest. Petitioner has therefore not demonstrated a valid constitutional claim with respect to this testimony. Consequently, Petitioner's claim is denied.

**5. Trial Court's Error in Not Convening a Pre-Trial Identification Hearing**

Petitioner next submits that the trial court erred in not convening a *sua sponte* pre-trial identification hearing. (D.E. No. 1 at 13.) Petitioner argues that because state witness and shooting victim, Sheldon Oaks, testified that he informed law enforcement shortly after the shooting that he could not identify who shot him, but was coerced to sign a photograph of petitioner, the court should have convened an identification hearing. (*Id.*) The Appellate Division denied this claim on Petitioner's direct appeal as follows: "We find no plain error in the trial court's failure *sua sponte* to require a *Wade* hearing. The central issue in the trial was not whether the identification procedures the police used were unduly suggestive but whether Oaks' and Fisher's recantations were credible." *Camel*, 2012 WL 996606 at *8.

At Petitioner's trial, Sheldon Oaks recanted the statement that he provided to the police shortly after the shooting (D.E. No. 18-3 at 16-17, 24-25), denied identifying anyone's photograph in a photo array (*Id.* at 33-35), and denied the testimony he gave to the grand jury. (D.E. No. 18-3 at 38, 81.) Oaks subsequently testified that he was forced to select and sign his name next to Petitioner's photograph from the photo array. (*Id.* at 67.) As a result of Oaks' recantation, the jury was allowed to hear the recorded statement he gave to the police.[2] (*Id.* at 23.) Oaks then testified that although he did identify Petitioner as the shooter when the police met with him shortly

[2] The recorded statement was not transcribed and is not part of the record before this Court. The record reflects that the jury had a transcribed version of the statement in addition to the audio statement. (D.E. No. 18-3 at 22-23.)

after the shooting, it was only because they offered him an attractive plea deal in his own pending firearm possession case.  (D.E. No. 18-3 at 58-59, 64-65, 78.)

During the trial, Detective Chirico of the Newark Police Department testified about meeting with Oaks, who was then hospitalized, shortly after the shooting to obtain a suspect identification.  (D.E. No. 18-5 at 7-15.)  Detective Chirico testified that he had no knowledge of the particular facts of the case and that his sole role in the case was to show Oaks a photo array of possible suspects.  (*Id.* at 7-8.)  Chirico indicated that he was alone with Oaks and that he was even unaware whether a photograph of the actual suspect was included in the photo array he presented to Oaks.  (*Id.* at 8, 15.)  Chirico stated that Oaks viewed a photo array containing six photographs and identified Petitioner's photograph as that of the person who shot him.  (*Id.* at  11.)   He described Oaks' demeanor as calm and noted that Oaks did not indicate any uncertainty.  (*Id.* at 11.)

A *Wade* hearing is a preliminary inquiry to determine the admissibility of an identification. *United States v. Wade*, 388 U.S. 218, (1967).  A pretrial identification procedure violates due process when the identification is (1) unnecessarily suggestive and (2) creates a substantial risk of misidentification.  *United States v. Burnett*, 773 F.3d 122, 133 (3d Cir. 2014) (citations omitted). "An impermissibly suggestive identification procedure can occur in four settings:  a show-up, a photo array, a line-up and in court."  *United States v. Brownlee*, 454 F.3d 131, 137 (3d Cir. 2006).

Here, the record reflects that Oaks' trial testimony was contradictory.  He vacillated between admitting that the handwriting (including the signature) on the photo array was his.  He reluctantly admitted that he did provide a statement, along with grand jury testimony, that inculpated the Petitioner but attempted to justify his prior statements by making allegations of coercion by law enforcement.  Oaks was impeached by his own prior statements indicating that he

30

was aware and could identify the person who shot him and his two friends.  Therefore, despite his

reluctance to stand by his earlier statements once he was called to testify against Petitioner at trial,

the state court considered the matter to be an issue of Oaks' credibility rather than the

constitutionality of the out-of-court identification process.  In light of the record before this Court,

the state court's decision was not an unreasonable application of the facts nor was it contrary to

clearly established federal law.  Accordingly, this claim is denied.

### 6.  Trial Court's Erroneously Permitting Sheldon Oaks to Testify in Prison Garb, Handcuffs, and Leg Restraints

Petitioner next submits that that the trial court should not have permitted Oaks to testify

while wearing prison-issued attire and arm and leg restraints.  (D.E. No. 1 at 14.)  Petitioner argues

that the prosecutor used Oaks' attire to undermine his credibility by arguing in his summation:

"you saw something about Sheldon Oaks' demeanor."  (*Id.*)  He further argues that the trial court

should have held "(1) a hearing to determine whether the restraints were necessary for courtroom

security; or (2) the issuance of a limiting instruction advising the jury that the prison garbs and

handcuffs had no bearing on the witness' credibility or the determination of the petitioner's guilt."

(*Id.*)

The Appellate Division denied the following claim on Petitioner's direct appeal as follows:

> Nor, in the context of this trial, was it plain error to permit Oaks to
> testify in prison garb. In fact, in cross-examining Oaks and in his
> summation, defense counsel made strategic use of Oaks' status, as a
> convicted criminal allegedly offered leniency, to impeach the
> credibility of his prior statements identifying defendant as the
> shooter.

*Camel*, 2012 WL 996606 at *8.

There is no Supreme Court precedent that supports Petitioner's claim.  The Supreme Court

has addressed a *defendant*'s prison–issued attire and visible restraints during trial.  *See Estelle v.*

*Williams*, 425 U.S. 501 (1976); *see also Deck v. Missouri*, 544 U.S. 622 (2005).  However, this right has never extended to prosecution or defense witnesses.  *See Thompson v. Warren*, No. 11–7164, 2014 WL 3778738 at *5 (D.N.J. July 31, 2014) ("[N]o extension of the *Estelle v. Williams* holding to witnesses could be warranted, since the principal interest protected by the Due Process Clause is the presumption of innocence accorded to criminal defendants: a concern wholly inapplicable to even defense witnesses.") (citations omitted)).  Petitioner has not demonstrated that his rights were violated by the witness's appearance.  In light of the record before this Court, the state court's decision was not an unreasonable determination nor was it contrary to clearly established federal law.

### B.    Ineffective Assistance of Counsel Claims

The Court turns to Petitioner's ineffective assistance of counsel claims.  Petitioner was represented at trial by Sterling Kinsale, Esq.

The Supreme Court set forth the standard by which courts must evaluate claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984).  First, the defendant must show that counsel's performance was deficient.  This requirement involves demonstrating that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment.  *Id.* at 687.  Second, the defendant must show that he was prejudiced by the deficient performance.  *Id.*  This requires showing that counsel's errors deprived the defendant of a fair trial.  *Id.*  "With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which

we expect will often be so, that course should be followed.'" *Rainey v. Varner*, 603 F.3d 189, 201 (3d. Cir. 2010) (quoting *Strickland*, 466 U.S. at 697)).

Counsel's performance is deficient if his representation falls "below an objective standard of reasonableness" or outside of the "wide range of professionally competent assistance." *Id.* at 690. In examining the question of deficiency, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. In addition, judges must consider the facts of the case at the time of counsel's conduct, and must make every effort to escape what the *Strickland* court referred to as the "distorting effects of hindsight." *Id.* The petitioner bears the burden of showing that counsel's challenged action was not sound strategy. *See Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). Furthermore, a defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694.

When assessing an ineffective assistance of counsel claim in the federal habeas context, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). "A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review under the *Strickland* standard itself." *Id.* Federal habeas review of ineffective assistance of counsel claims is thus "doubly deferential." *Id.* (quoting *Cullen v. Pinholster*, 131 S.Ct. at 1403). Federal habeas courts must "take a highly deferential look at counsel's performance" under *Strickland*, "through the deferential lens of § 2254(d)." *Id.* (internal quotation marks and citations omitted).

### 1.   Ineffective Assistance for Failure to Request a *Wade* Hearing

Petitioner submits that his counsel was ineffective for failing to request a *Wade* hearing despite law enforcement's use of a suggestive identification procedure.  (D.E. No. 1 at 15.) Although Petitioner does not make any supporting arguments, the Court will consider the arguments he submitted under his similar trial error claim.

The last reasoned state court decision with respect to this claim is the PCR Court's decision. The PCR Court denied the claim, explaining that

> [d]efense counsel was not ineffective in his decision to withdraw the motion for a *Wade* hearing.  This argument was advanced by Defendant on direct appeal.  The Appellate Division found "no plain error in the trial court's failure sua sponte to require a *Wade* hearing. The central issue in the trial was not whether the identification procedures the police used were unduly suggestive but whether Oaks' and Fishers' recantations were credible" p. 20 DP (a) 39. Defendant is barred from asserting this prayer for relief in a post-conviction relief.  R. 3:22-5.

(D.E. No. 17-16 at 13-14.)

While the PCR Court denied the claim pursuant to New Jersey Rule of Court 3:22-5 as having already been adjudicated, Petitioner's claim on direct appeal was not an ineffective assistance claim.  *See Camel*, 2012 WL 996606 at *8.  Furthermore, although Petitioner raised this claim before the PCR Court, he did not appeal the denial to the Appellate Division.  Therefore, this claim appears to be unexhausted.  Nonetheless, this Court will review the merits of the claim *de novo*.  *See Granberry*, 481 U.S. at 131, 135.

As already pointed out in this Court's review of Petitioner's stand-alone *Wade* hearing claim, the record does not support that a suggestive identification procedure occurred.  At Petitioner's trial, Detective Michael Chirico described how he obtained an identification from Oaks.  (D.E. No. 18-3 at 52-60.)  Detective Chirico testified that he was selected to visit Oaks to

obtain an identification because he had no familiarity with the facts of the case. (*Id.* at 54.)  Chirico also testified that Oaks was cooperative and identified Petitioner from the photo array.  (*Id.* at 58-59.)  More importantly, the issue in the trial was not an alleged misidentification based on overly suggestive procedures, with the witnesses standing by their prior identifications at trial.  Instead, the defense argued that the witness recantations should be believed.  The trial court permitted the defense ample opportunity to pursue this line of attack, which was (apparently) rejected by the jury.

Therefore, Petitioner has not established how he was prejudiced by his counsel's decision not to request a *Wade* hearing.  Petitioner's claim is denied.

### 2. Ineffective Assistance of Counsel for Failure to Investigate Petitioner's Case

Petitioner next claims that counsel was ineffective for failing to "investigate the facts and circumstances" of his case.  (D.E. No. 1 at 15.)  Petitioner does not provide any facts or arguments in support of this claim.  The prosecution responds that this claim is belied by his trial counsel's testimony at the PCR hearing that he interviewed potential witnesses such as Petitioner's girlfriend before deciding against calling her as a trial witness.  (D.E. No. 17 at  57.)

Although Petitioner did raise an identical claim before the PCR Court (D.E. No. 17-15 at 4), he did not appeal the issue to the Appellate Division.  Therefore, this claim appears to be unexhausted.  Nonetheless, this Court will review the merits of the claim *de novo.  See Granberry,* 481 U.S. at 131, 135.

Because Petitioner has provided very little information to support this claim in the instant filing as well as in the PCR Court filing, the Court turns to the PCR evidentiary hearing transcript for guidance.  Petitioner's trial counsel testified that he interviewed witnesses such as Petitioner's desired alibi witness, Lakeesha Kelly.  (D.E. No. 18-19 at 41.)  Further, Ms. Kelly also testified at

the evidentiary hearing that she spoke with defense counsel about her recollection of Petitioner's whereabouts on the day of the shootings.  (*Id.* at 55-56.)

Petitioner has not presented sufficient evidence to support his claim that counsel failed to investigate in preparation for the trial.  He has not demonstrated that his counsel was ineffective. Even if Petitioner had pointed to sufficient facts, he has not demonstrated prejudice because he has not adequately demonstrated what exculpatory evidence would have been revealed by such an investigation.  Therefore, this claim is denied.

### 3.  Ineffective Assistance of Counsel for Failure Advise Petitioner of his Sentencing Exposure

Petitioner next claims that counsel was ineffective for failing to advise him of his sentencing exposure.  (D.E. No. 1 at 15.)  Petitioner submits the following:

> On May 8, 2008, the state's plea offer was 18 years' imprisonment with a NERA parole disqualifier, which petitioner signed and rejected.  Plea discussions continued thereafter, and, according to trial counsel, the state's plea offer went "down to 5 and then back up," resulting in a plea offer of seven years' imprisonment with NERA parole disqualifier.

(D.E. No. 1 at 16.)

Petitioner raised this claim before the PCR Court, and it was denied as follows:

> The Prosecutor's first plea offer to Kaseem Camel was a plea to first degree murder as amended to second degree manslaughter N.J.S.A. 2C:11-4(B)(1) and 3rd degree unlawful possession of a weapon N.J.S.A. 2C:39-4.  At time of sentencing the state agreed to recommend a prison sentence of 7 years with 85% parole ineligibility pursuant to the No Early Release Act and the Graves Act.  (Defense Brief page 2).
>
> In the Pretrial Memorandum the section provided for the memorialization of the plea offer and sentence recommendations reads "18 years pursuant to NERA."  The Pre Trial Memorandum also reads that defense was asserting "No Special Defense."  (DB 1).

> *Defendant rejected the plea offer as evidenced by his signature on the Pre Trial Memorandum at the time of the plea cut off.*
>
> Defendant's [sic] that he was unaware of his exposure at the time of the plea, and that defense counsel did not communicate the plea offer(s) are belied by defendant's signature on the pretrial memorandum. . . .  The Court finds no substantive evidence that the trial defense counsel withheld any plea offers from the defendant.

(D.E. No. 17-16 at 14 (emphasis added).)

The Appellate Division affirmed the PCR Court's denial, stating that "[b]ased on the facts as [PCR Judge Verna G. Leath] found them, we agree that defendant's trial counsel did not render ineffective assistance.  Rather, he communicated the State's plea offers to defendant, and he engaged in reasonable trial strategy in deciding not to call Kelly as a witness." *Camel*, 2016 WL 5417412 at *2.

Ineffective assistance of counsel claims arising out of the plea process are analyzed under the *Strickland* standard.  *See Hill v. Lockhart*, 474 U.S. 52 (1985).  Claims of ineffective assistance of counsel in the context of a defendant rejecting a plea offer are considered under the standard set in *Lafler v. Cooper*, 566 U.S. 156 (2012).  The Supreme Court in *Lafler* considered the claims of a petitioner who was allegedly advised by trial counsel to reject the plea offer based on the likelihood of his acquittal at trial.  *Id.* at 163.  As with all ineffective assistance of counsel claims, the petitioner is required to show that counsel's performance was deficient and prejudicial.  *See Strickland*, 466 U.S. at 687.  The petitioner's showing that "the outcome of the plea process would have been different with competent advice" is dipositive in establishing *Strickland's* prejudice requirement.  *Lafler*, 566 U.S. at 163.  "Knowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty."  *United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992).

At Petitioner's PCR evidentiary hearing, he denied having knowledge of any plea offers extended to his attorney, other than an eighteen-year sentence, which he denied.  (D.E. No. 18-19 at 81.)  He testified having never seen what was identified as "defense exhibit number 2," which was described as "a plea offer from the State."  (*Id.* at 82.)[3]  Petitioner also testified that although he did not shoot any of the three victims, he would have accepted a plea bargain for a seven-year prison sentence had his trial attorney presented it to him.  (*Id.* at 94-96.)

His trial attorney also testified about the plea negotiations as follows:

Q.  Were there any plea offers in this case?

A.  In homicide cases, in Essex, you know, it's for the Defense to approach the Prosecutor about a plea.  I think that's our more recent policy.

At that time I think it was ongoing discussion about plea.  I think on paper the numbers hovered somewhere between 20 and 18.  I remember 20.  It may have been as low as 18 at some point but as the trial got upon us, the numbers went to as low as 5 and then incrementally rose as I guess the State felt their case got better and the Defense case looked worse.

I know at some point there was a discussion when the number was 5 and then I know there was some discussion when the number was 7.

I think at some point I was fighting and at that point the State withdrew any offer because I think these discussions went from the outset of the case, I believe, on and through deliberations.

MR. TORAYA:  Can I approach the witness, please?

Q.  I am showing you D-1, D-2.  Do you recognize that?

A.  Yes.

Q.  You recognize that?

---

[3] Petitioner testified at the PCR hearing that he did not learn of the document's existence until after he was convicted.  (D.E. No. 18-19 at 97.)

A.  I recognize it.

Q.  Can you tell us what D-1 is?

A.  D-1 is a plea cutoff form.  Client determines that he wants to go to trial, *it's where he's advised of what the maximum penalties are for the crimes that he is charged with if convicted after trial, the extent to whether he's Extended Term or not, the extent to which presumptive prison time applies to the various counts, parole ineligibility applied and some other information about his background and the extent to which any sentence or plea would affect any open charges.  What the plea offer was* and just some other minutia with regard to unfinished discovery and whether he was advised of his right to be here or not.

Q.  What was the plea offer?

A.  The offer on the plea cutoff date for the date this document was filed which was May 8, 2008, 18 years pursuant to N.E.R.A.

Q.  Is that your writing on that document I assume?

A.  I see my signature on the last page.  I recognize my handwriting throughout.

Q.  Filled out pretrial memo?

A.  That's correct.

Q.  Before filling that out, you went over it with Mr. Camel?

A.  Yes.

Q.  He signed, right?

A.  Yes.  It appears to be his signature here.

Q.  So after that date you were given another plea by the State; Is that correct?

A.  After that date discussions went on and on and we discussed many numbers.  I indicated a 5 was discussed and a 7 was discussed. I think we went from 18 to 15 to 10, down to 5 and then back up.

Q.  Do you remember if any of those discussions were memorialized in writing?

39

A.  I am sure some of them were.

Q.  D-2 in front of you.  You recognize that document?

A.  D-2?  I recognize it.

Q.  I recognize it.

A.  D-2 appears to be a Plea Request to Recommend Disposition dated the 9th of December, at least was signed the 9th of December, 9th of January 2008, 9th of September 2008.

Q.  *So that was after the Pretrial memo, after the plea cutoff?*

A.  *That's correct.*

Q.  And what was that offer?

A.  *That offer at that time was 7 years pursuant to N.E.R.A.*

Q.  *Was that communicated to the defendant?*

A.  *All plea offers that were made by the State were communicated to the defendant.*

Q.  Did you even do that in writing?

A.  Did I do it in writing?  We have oral conversation.  "The State is making a recommendation of 5 years.  Are you interested?"  If he is the Prosecutor will get an offer from his Supervisor.  If you are not interested - - you know it's just talk, you express a number and it's just talk, "Are you interested?"  "No, I am not."  That's some of the many discussions we've had regarding plea offers.

Q.  You didn't have the defendant sign anything?

A.  No, that's not necessarily my protocol.

Q.  Why isn't that your protocol?

A.  I feel I have an open relationship with my client.  We speak, I tell him the offer.  It's not a secret.  For some reason I kind of feel but it's just my protocol.

Q.  The pretrial memorial is done on the record?  The plea cutoff?

40

A.  That would  be done on the record.

Q.  The defendant signs that?

A.  That's correct.

Q.  Okay, but you didn't think it was important in this case to put anything in writing or memorialize anything from the defendant that he was not offered 7 years, correct?

A.  I didn't think it was important, no, I didn't - - won't say that I didn't think it was important.

(D.E. No. 18-19 at 21-25 (emphases added).)

Petitioner argues that he was unaware of his "penal consequences" had he been convicted at trial, however the record reflects that his trial attorney went over a "plea cut-off" form that discussed his sentence exposure, including the potential maximum sentence.  (D.E. No. 18-19 at 22.)  At the evidentiary hearing, Petitioner did not deny that he signed that particular document. (*Id.* at 81.) To the extent that Petitioner appears to be arguing that his trial attorney never conveyed the seven-year plea offer, the state court's decision was not an unreasonable application of the facts nor was it contrary to clearly established federal law.  At the PCR hearing, trial counsel testified that several plea offers were discussed with Petitioner but Petitioner chose to stand trial. As a result, the state court found that trial counsel did relay all plea offers to his client and rejected Petitioner's ineffective assistance claim.   Consequently, he has not made out a meritorious ineffective assistance claim.  Accordingly, this claim is denied.

**4.  Ineffective Assistance of Counsel for Failing to Object to Sheldon Oaks Testifying While Wearing Prison-Issued Attire, Handcuffs, and Leg Restraints**

Petitioner submits that his counsel was ineffective for failing to object to state witness, Sheldon Oaks, testifying in prison-issued garb, handcuffs, and leg restraints.  (D.E. No. 1 at 15.)

While Petitioner raised this claim in his initial PCR filing (D.E. No. 17-15 at 4), it does not appear to have been addressed in the court's opinion. (D.E. No. 17-16.) Petitioner did not appeal the issue to the Appellate Division, however. Nonetheless, this Court will review the merits of the claim *de novo*.[4]

As previously discussed in this Court's analysis of Petitioner's similar trial court error claim, *see supra* Section IV, A 6, Oaks attire and restraints did not implicate Petitioner's constitutional rights. As the Appellate Division pointed out when denying Petitioner's related trial court-error claim, "in cross-examining Oaks and in his summation, defense counsel made strategic use of Oaks status as a convicted criminal allegedly offered leniency, to impeach the credibility of his prior statements identifying defendant as the shooter." *See Camel*, 2012 WL 996606 at *8. Counsel's strategic decision was not unreasonable. Petitioner has not demonstrated how counsel's performance was deficient. Therefore, this claim is denied.

### 5. Ineffective Assistance of Counsel for Failing to Consent to the Trial Court's Offer to Provide a Jury Instruction on Why a Witness was Seated

Petitioner next claims that his counsel was ineffective for not accepting the trial court's offer to provide a jury instruction as to why a state witness, Sheldon Oaks, was already seated in the witness stand prior to the jury's entering the courtroom. (D.E. No. 1 at 15.) While Petitioner raised this claim in his PCR filing (D.E. No. 17-15 at 4), it does not appear to have been addressed in the PCR court's opinion. (D.E. No. 17-16.) However, Petitioner did not appeal the issue to the Appellate Division. Nonetheless, this Court will review the merits of the claim *de novo*. Respondents assert that counsel may have declined the instruction "because it would have undercut

---

[4] On direct appeal, Petitioner unsuccessfully raised a trial court error claim because Oaks was allowed to testify in prison garb and arm and leg restraints. However, that claim was not raised in the context of ineffective assistance. *See Camel*, 2012 WL 996606 at *8.

counsel's strategic decision to use Oaks' status as a convicted criminal supposedly offered lenience to impeach Oaks' credibility."  (D.E. No. 17 at 62.)

At Petitioner's trial, Oaks was already seated in the witness stand before the jury re-entered the courtroom from a lunch recess.  (D.E. No. 18-2 at 108.)  After Mr. Oaks was excused as a witness, the trial court inquired of whether counsel wanted any special instructions in light of Mr. Oaks' being seated at the witness stand before the jury entered.  (D.E. No. 18-3 at 98.)

> THE COURT:  The record will reflect that Mr. Oaks was on the stand when the jury came out, and I have just indicated, he was on the stand when they left.
>
> Are there any special instructions that either side would like me to give concerning his being on the stand when they came in or on the stand when he left as opposed to why he didn't walk in and out in their presence as most witnesses do?
>
> The State?
>
> MR. DIRKIN:  No, Your Honor.
>
> THE COURT:  Mr. Kinsale?
>
> MR. KINSALE;  No, your Honor.
>
> THE COURT:  Do you agree, Mr. Camel?
>
> THE DEFENDANT:  Yes.
>
> THE COURT:  Thank you.

(*Id.*)

Here, Petitioner has not provided any arguments to support how the outcome of his trial would been different had counsel requested the trial court to provide the instruction.   As Respondents point out, the defense was not interested in keeping Oaks' status as a convicted criminal from the jury.  Petitioner's counsel made a strategic decision that was not unreasonable.

Petitioner had not demonstrated ineffective assistance on this point.   Therefore, this claim is denied.

### 6.   Ineffective Assistance of Counsel for as to Dr. Perez's Testimony

Petitioner next claims that his counsel was ineffective for failing to object to Dr. Perez's testimony where she referenced another medical examiner's autopsy report as well as for failing to cross-examiner Dr. Perez.  (D.E. No. 1 at 15.)  While Petitioner raised this claim in his initial PCR filing (D.E. No. 17-15 at 4), it does not appear to have been addressed in the court's opinion. (D.E. No. 17-16.)   However, Petitioner did not appeal the issue to the Appellate Division. Nonetheless, this Court will review the merits of the claim *de novo*.[5]

The Court previously discussed, and rejected, Petitioner's similar claim as to the hearsay issue.   As to Petitioner's argument that counsel should have cross-examined Dr. Perez, the Appellate Division pointed out when denying Petitioner's related trial court-error claim:

> Defense counsel did not even cross-examine Dr. Perez, and with good reason.  There was no genuine issue at this trial about the cause of Mumford's death.  The police found his bullet-riddled body lying in the courtyard, soon after the shooting incident that was described by eyewitnesses Oaks and Fisher.  No one, including the defense, argued that his death was not a homicide.  The issue in this case was the identity of the killer.

*See Camel*, 2012 WL 996606 at *7.

Petitioner has not demonstrated how counsel's failure to object to Dr. Perez's testimony or his counsel's decision not to cross-examine her affected the outcome of the trial and he therefore failed to show prejudice.  As the Appellate Division note, Mumford's homicide was not contested. Accordingly, this claim is denied.

---

[5] On direct appeal, Petitioner unsuccessfully argued that Dr. Perez's testimony improperly relied on inadmissible hearsay as to Dr. Mambo's report.  *See Camel*, 2012 WL 996606 at *7.  However, that claim was not raised in the context of ineffective assistance.

**7.  Ineffective Assistance of Counsel for Failure to Challenge the Trial Court's Recharge on Attempted Murder and Aggravated Manslaughter**

Petitioner next argues that counsel was ineffective for failing to object to the trial court's "extensive recharge" on the elements of attempted murder and aggravated manslaughter.  (D.E. No. 1 at 15.)  While Petitioner raised this claim in his initial PCR filing (D.E. No. 17-15 at 4), it does not appear to have been addressed in the court's opinion.  (D.E. No. 17-16.)  However, Petitioner did not appeal the issue to the Appellate Division.  Nonetheless, this Court will review the merits of the claim *de novo*.

During deliberations, the jury sent a note asking for an explanation of the crimes of attempted murder and aggravated manslaughter.  (D.E. No. 18-15 at 4.)  After providing the instructions for both offenses, the trial judge asked the parties whether they objected to the instructions as provided.  (*Id.* at 19.)  Both attorneys answered that they did not.  (*Id.*)

To show that a jury instruction violated due process, Petitioner must show "both that the instruction was ambiguous and that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt."  *Waddington v. Sarausad*, 555 U.S. 179, 190-91 (2009) (internal citation and quotation marks omitted).  The instruction "must be considered in the context of the instructions as a whole and the trial record." *Id.* at 191 (internal citation and quotation marks omitted).  Moreover, "it is not enough that there is some slight possibility that the jury misapplied the instruction, the pertinent question is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* (internal citation and quotation marks omitted).  "In other words, the inquiry requires careful consideration of each trial's unique facts, the narratives presented by the parties, the arguments counsel delivered to the jurors before

they retired to deliberate, and the charge as a whole." *Williams v. Beard*, 637 F.3d 195, 223 (3d

Cir. 2011) (citing *Waddington*, 555 U.S. 179).

Here, Petitioner just describes the re-instruction as "extensive."  However, the trial court

articulated that it "reread [] the entire charges as requested."  Petitioner has not demonstrated how

he was prejudiced by counsel not objecting to the trial court answering a jury note about an offense

by re-reading the instructions related to the offense.  Petitioner has not pointed to any error

contained in the re-instruction.  Petitioner has not demonstrated prejudice.  Accordingly, this claim

is denied.

### 8.   Ineffective Assistance for Failing to Call Alibi Witnesses

Lastly, Petitioner claims that his counsel was ineffective for failing to interview and or call

several alibi witnesses including: Damarco, Lakeesha Kelly, Adam Horton, and Kevin Villa.  (D.E.

No. 1 at 15.)  While Petitioner raised this claim before the PCR Court, he only appealed the claim

relating to Lakeesha Kelly.  *See Camel*, 2016 WL 5417412 at *1.  Therefore,  this Court will

review the claims as it relates to the balance of the individuals, *de novo*.

Petitioner submits that his girlfriend at the time of the shooting, Lakeesha Kelly, should

have been called to testify as an alibi witness on Petitioner's behalf.  (D.E. No. 1 at 15-16.)

Petitioner does not support his argument with any relevant facts but rather recounts Kelly and his

trial counsel's testimony at the PCR evidentiary hearing.  (*Id.*)  The Court also addressed Ms. Kelly

above as to Petitioner's claim concerning his counsel's failure to investigate.

The Appellate Division affirmed the PCR Court's denial of the claim as follows:

> After holding an evidentiary hearing at which defendant, Kelly, and
> defendant's former trial counsel testified, Judge Verna G. Leath
> rejected those claims.  Based on the attorney's testimony, the judge
> found that . . . that trial counsel had interviewed Kelly prior to the
> trial, and had determined that there were significant weaknesses in
> her proposed testimony and an alibi defense was unlikely to

succeed.  According to the attorney, Kelly claimed that one the day of the killing, defendant came home from work before 5:00 p.m. and stayed home all night thereafter.  However, the attorney testified that Kelly was not clear in her recollection of the time and was unable to explain how she allegedly recalled defendant's time of arrival on that particular evening.  Nor were Kelly or defendant able to document the claim that defendant was actually employed in November 2006.  Judge Leath noted similar problems in Kelly's PCR hearing testimony.  She found that trial counsel was not ineffective in deciding not to call Kelly as a witness.

. . .

After reviewing the record, we find no basis to second-guess Judge Leath's evaluation of witness credibility, and we conclude that her decision is supported by substantial credible evidence.  *See L.A.*, supra, 433 N.J. Super. at 17.  Based on the facts as she found them, we agree that defendant's trial counsel did not render ineffective assistance.  Rather, he communicated the State's plea offers to defendant, and he engaged in reasonable trial strategy in deciding not to call Kelly as a witness.

*See Camel*, 2016 WL 5417412 at *1-2.

Petitioner has not shown how counsel's performance was deficient because of his failure to call Ms. Kelly, especially in light of his counsel's stated rational for not calling her and Ms. Kelly's own testimony at the PCR evidentiary hearing.  The Court specifically notes the PCR Court's summary of the testimony with respect to the alibi witness claim:

Lakisha Kelly testified at the evidentiary hearing.  Kelly and Camel are the parents of four children.  On November 29, 2006 she recalls that Camel came home from work, ate dinner and played video games with their children before going to bed.  On cross examination she faltered and was not definitive as to Camel's time of arrival.  In addition, during the trial Ms. Kelly had been charged with obstruction of justice for allegedly approaching a juror protesting Camel's innocence, during a break in the trial proceedings.  She was not indicted on those charges.  She insisted that Camel had been at work and that she been available to testify at trial but was not asked to do so.

Sterling Kinsale, Esq, Camel's trial attorney testified at the evidentiary hearing.  He indicated that calling Kelly as a witness

> during trial would be more problematic then [sic] helpful to the [sic]
> Camel's case and he did not recommend moving forward with an
> alibi by defense.
>
> . . .
>
> Kinsale reviewed the initial incident report on November 29, 2006
> and noted that the Camel was not arrested until four months later.
> He indicated that the passage of time influenced his decision to not
> allow Kelly to testify in addition to her inability to recall specifically
> the events of the day in November.
>
> Camel testified at the evidentiary hearing. Camel indicated that he
> told his trial attorney that his boss and Kelly could testify to his
> whereabouts during the night of the incident. Camel testified that
> his attorney believed that he did not punch a time card at work and
> Ms. Kelly had a bias to possibly lie for him, they were not good
> witnesses on his behalf.

(D.E. No. 18-19 at 10-11.)

Petitioner's counsel's PCR testimony reflects a reasonable, strategic decision not to call

Kelly. In light of the record, the state court's decision was not an unreasonable application of the

facts nor was it contrary to clearly established federal law. Accordingly, this claim will be denied.

Petitioner next submits that his trial counsel was ineffective for failing to interview his

former supervisor, Damarco, as a potential alibi witness. (D.E. No. 1 at 15.) The instant petition

does not indicate what Damarco's testimony would have entailed. However, a review of the state

court record reveals that Petitioner's supervisor, on the day that the shooting occurred, was named

Damarco. (D.E. No. 17-15 at 4.)

At Petitioner's PCR evidentiary hearing, Petitioner testified about his discussions with his

trial counsel regarding calling his supervisor as a witness.

> Q. What did you talk about regarding your boss?
>
> A. I told him my boss could verify I got off work at four o'clock.
> He told me being though I don't punch a time card it was no good,

48

> no use to call my boss because I didn't punch in and out on a
> clock.
>
> I told him that I didn't punch in and out and he said my boss was
> useless.

(D.E. No. 18-19 at 75.)  Petitioner also testified that he travelled approximately thirty minutes by bus from his place of employment to his home that evening.  (*Id.* at 77.)

Notwithstanding Petitioner's insistence that his supervisor could have provided for his whereabouts shortly before the shooting occurred, Petitioner has not produced any evidence from Damarco indicating the same.  Damarco, for example, did not  testify or even submit an affidavit at the PCR hearing reflecting that he (Damarco) was an alibi witness.  Petitioner has not demonstrated that counsel was ineffective.  Accordingly, this claim will be denied.

Petitioner next submits his trial counsel was ineffective for failing to interview or call "Adam Horton and/or parole officer Kevin Villa" as potential alibi witnesses.  (D.E. No. 1 at 15.) Petitioner does not provide any facts about who Adam Horton was or how either of these individuals' testimony may have impacted his defense.[6]  *See* Habeas Rule 2(c)(2), (providing that a habeas petitioner must "state the facts supporting each ground.")  Accordingly, this claim will be denied.

### 9. Trial Counsel Was Ineffective for Failing to Cross-Examine Detective Vincent Vitiello

Petitioner next submits that his trial counsel was ineffective for failing to cross-examine Detective Vincent Vitiello.  (D.E. No. 1 at 15.)  While this claim was considered and denied by

---

[6] Although Petitioner raised the claim before the PCR Court, it did not consider the claim. Petitioner's state court filings do not provide any additional information about these individuals' identities or the substance of their potential testimony.

the PCR Court (D.E. No. 17-16), Petitioner did not appeal the issue to the Appellate Division. Nonetheless, this Court will review the merits of the claim *de novo.*

Detective Vitiello testified at Petitioner's pre-trial *Gross*[7] hearing.  The state moved for the hearing once they determined that state witness, Sheldon Oaks, would be recanting his prior statement to the police.  (D.E. No. 18-2 at 5.)  Detective Vitiello testified that he took an audio statement of Oaks shortly after the November 2006 shooting in question.  (*Id.* at 62.)  After the prosecutor conducted his direct examination of Detective Vitiello, the defense asked the following:

> Q.  Officer, were you aware of Mr. Oaks' criminal background at this point?
>
> A.  I am sure that I did - - before speaking to him, I did check his criminal background, yes.

(*Id.* at 64.)

At Petitioner's PCR evidentiary hearing, trial counsel was asked about why he conducted such a limited cross-examination of Detective Vitiello.

> Q.  I am sorry, my question is why didn't you cross examine either of these two witnesses?  That's my question.
>
> A.  At the *Gross* hearing?
>
> Q.  Yeah.  At the *Gross* hearing.
>
> A.  The witnesses had indicated – I think if I recall correctly, I reviewed the transcript, I think it was already established that the witness had said enough in portions of the testimony that I felt that those statements were going to come in.
>
> In my usual practice if I am going to be subjected to especially officers at trial that I am not necessarily familiar with, I don't like to, you know, expose myself so much so in a *Gross* hearing in a hearing that I feel I am going to loose [sic] any way.

---

[7] Under New Jersey law, a hearing is required to determine the reliability of a witness's prior inconsistent out-of-court statement.  *State v. Gross*, 121 N.J. 1 (1990).

> I felt those statements were going to come in.  I felt it's a pro forma kind of motion that we do as defense attorneys where once the witness who we have no control over acknowledges this statement in a form, that it's pretty much going to come in.  I pull back and I wait to see what other angles I can use to my advantage at trial rather than extensive cross examination on an officer who may not be familiar with me and herego [sic] sometimes you loose [sic] in some instances the element of surprise of such attack at trial.

(D.E. No. 18-19 at 33-34.)

Petitioner has not shown how trial counsel's performance was deficient just because he thought trial counsel could have conducted a more rigorous cross-examination of Detective Vitiello.  Mr. Kinsale's testimony was that he strategically limited his examination at the pre-trial hearing so as to not to limit the effectiveness of his trial cross-examination of the same witness.  Petitioner has not demonstrated how counsel was ineffective for employing this particular strategy.  Accordingly, this claim is denied.

### 10. Ineffective Assistance of Counsel for Waiving Petitioner's Right to be Present at All Stages of the Trial

Petitioner lastly claims that his trial counsel was ineffective for failing to ensure his presence at all stages of the trial.  (D.E. No. 1 at 15.)  While Petitioner raised this claim in his PCR filing (D.E. No. 17-15 at 4), it does not appear to have been addressed in the court's opinion.  (D.E. No. 17-16.)  Nor did Petitioner appeal the issue to the Appellate Division.  Nonetheless, this Court will review the merits of the claim *de novo.*

At Petitioner's PCR evidentiary hearing, trial counsel was asked about his decision to waive Petitioner's presence during portions of the trial.  (D.E. No. 18-19 at 45.)  Mr. Kinsale testified that he did not recall any portion of the trial where Petitioner was not present for the proceedings.  (*Id.*)  Upon review of the trial record, this Court did not observe that Petitioner was excluded from any of the trial proceedings.  Petitioner's claim that he was not present for portions

of the trial is belied by the record, and therefore his ineffective assistance claim fails on this ground. Petitioner's claim is denied.

## IV.     CERTIFICATE OF APPEALABILITY

This Court must determine whether Petitioner is entitled to a certificate of appealability in this matter.  *See* Third Circuit Local Appellate Rule 22.1.  The Court will issue a certificate of appealability if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Based on the foregoing analysis, Petitioner has not made a substantial showing of denial of a constitutional right, and this Court will not issue a certificate of appealability.

## V.      CONCLUSION

For the reasons discussed above, Petitioner's habeas petition is denied.  An appropriate Order accompanies this Opinion.


Dated: October 13, 2020

JOHN MICHAEL VAZQUEZ
United States District Judge

52